

1633 Broadway
27th Floor
New York, NY 10019-6708

**Robert D. Balin**
212.603.6440 tel
212.489.8340 fax

robbalin@dwt.com

December 2, 2009

**Via ECF & Federal Express**

Magistrate Judge Ramon E. Reyes, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 263
Brooklyn, NY 11201

**Re:** ***National City Commercial Capital Co., LLC v. Photo Experts, Inc., Katy Pi and James Pi*, 08 Civ. 3170 (ENV)**

Dear Magistrate Judge Reyes:

We are counsel for defendants Photo Experts, Inc. ("PE"), James Pi and Katy Pi (collectively, the "PE Defendants") in the above-captioned action. Pursuant to this Court's instruction on November 12, 2009, the parties are writing jointly in order to set forth two discovery issues that the parties would like to raise with the Court at the 9:45 a.m. telephone conference on Friday, December 4, 2009.

## I. Photo Expert's Discovery Dispute with Punch

### A. The PE Defendants Request That Punch Produce Documents and Information Showing the Prices it Obtained on Sales of Xeikon 5000s From 2006-Present

The PE Defendants request that Punch produce documents and information showing the prices at which it sold used and new Xeikon 5000 digital printers – the exact model sold to Photo Experts – for the years 2006-present.

As the Court will recall, this action involves two transactions – one in November 2006 and the other in April 2007 – in each of which Punch Graphix Americas Inc. ("Punch") sold to PE a Xeikon 5000 digital printer and related equipment. Each transaction was financed by National City Capital Company, LLC ("NC") pursuant to leases under which title to the equipment was transferred to NC, which then leased the equipment back to PE. Although the First Xeikon (which was a demonstration model) was delivered to PE, because of problems with the Xeikon as well as delays in delivery of (and problems with) the contracted-for coating



Anchorage | New York | Seattle
Bellevue | Portland | Shanghai
Los Angeles | San Francisco | Washington, D.C.

www.dwt.com

machine, by letters dated February 18 and 19, 2008, PE rejected the first Xeikon – with the parties now disputing whether the rejection was timely. Thereafter, commencing by letter from its attorney dated February 21, 2008, PE repeatedly demanded that NC and Punch remove the First Xeikon from PE's premises. The dispute between the parties also resulted in a non-delivery of the Second Xeikon equipment, which has never been used since its sale to PE in April 2007, but remained in packing cartons at Punch's warehouse. It is undisputed that neither NC nor Punch ever removed the First Xeikon from PE's premises or ever attempted to resell either of the two Xeikons. Accordingly, one of the PE Defendants defenses in this action is failure by Punch and NC to mitigate their alleged damages by failing to resell the two Xeikons in the market (*See* PE Defendants' Answer to Second Amended Complaint, Sixth Affirmative Defense; the PE Defendants' Answer to Punch's Cross-Claims, Tenth Affirmative Defense) – rendering market information regarding sales prices for Xeikons obviously relevant to the issues in this case.

Accordingly, in the PE Defendants' recent document requests and interrogatories to Punch, Punch was asked to produce information regarding its last ten sales of Xeikon 5000s in the United States, including "the date and purchase price of that sale" – which Punch refused to produce on the grounds that such information is "not relevant". (*See* Punch's Response to the PE Defendants' Interrogatory No. 9 and Document Request No. 17, annexed as Exhibit A). In subsequent discussions, PE offered to narrow its request for sales price information to Xeikon sold between 2006 to the present. Taking a narrow and selective view of what it will, and will not produce, Punch agreed only to produce documents showing two sales it made of used Xeikon 5000s in 2009); and its counsel has represented that Punch sold no used Xeikons in 2008. Punch categorically refused to produce documents and information concerning (1) any resale of used Xeikon 5000s in 2007 and 2006;[1] and (2) the sales of new Xeikon 5000s from 2006 to present.

Market price information for both new and used Xeikon 5000s is directly relevant to core legal issues underlying the claims and defenses in this action – specifically, the measure of damages potentially recoverable by Punch and NC and their duty to minimize damages. First, one of the PE Defendants' defenses in this action is that NC's and Punch's damages (if any) should be reduced because they did not minimize their alleged damages by failing to repossess and resell the equipment at issue at the time that PE first notified them of its cancellation in February 2008. Notwithstanding PE's repeated demands that NC and Punch remove and repossess the digital printing equipment, one piece of equipment remains to this day on PE's premises, and the other equipment, which was never delivered to PE was, until very recently, stored in crates at Punch's warehouse.

[1] In Punch's response below, it now states that it will produce information regarding sales of used Xeikon 5000s from the later half of 2007, starting from July. To the extent that Punch is now willing to reconsider its objection regarding 2007 sales, it cannot arbitrarily draw a self-created line at July 2007 but should be directed to produce sales for all of 2007 as well as 2006.

When seeking to recover damages under a sales contract or lease, both a seller (here, Punch) and a lessor (here, NC) are subject to a "duty to minimize damages, also known as the avoidable consequences rule" which requires the seller or lessor "to use reasonable care to avoid loss. Thus, the defendant cannot be charged with damages that the plaintiff might have avoided with reasonable effort . . . because such harm either was not caused by the defendant or need not have been caused by the defendant." *Information Leasing Corp. v. Chambers,* 152 Ohio App. 3d 715, 726, 730, 789 N.E. 2d 1155, 1167 (Ct. of App., 1st Dist. 2003)[2] (where lessor brought action against lessee to recover unpaid past and future rents on commercial ATM finance lease, holding that under both common law and UCC 2A, lessor was required to minimize damages); *Information Leasing Corp. v. Pall, Inc.*, 806 N.E.2d 178, 180-81 (Ohio Ct. App. 2004) ("the UCC applies its own mitigation theory" by awarding the lessor future rents "only above what he would have made had he repossessed the [equipment] and re-rented it at the market rate."). *Indeck Energy Services, Inc. v. NRG Energy, Inc.*, No. 03 C 2265, 2004 WL 2095554, at *13 (N.D.Ill. Sept. 16, 2004) ("Illinois law requires a seller to take reasonable measures to mitigate the damages recoverable when a contract is breached.") (citing *Kallman v. Radioshack Corp.*, 315 F.3d 731, 740 (7th Cir. 2002)).[3]

Second, market price information is also relevant to ascertain a seller's measure of damages. Under Article 2 of the UCC, as adopted by Illinois (which applies to Punch's claims), the primary measure of a seller's damages for "non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price." 810 ILCS 5/2-708(1); *see also* 1 White & Summers, Uniform Commercial Code § 7-7 (5th ed. 2009); *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 683 (7th Cir. 1987) (a seller's damages for a buyer's breach are measured by "subtracting the market price at the time and place for tender from the contract price") (applying Illinois law). Similarly, Article 2A of the UCC, as adopted by Ohio (which applies to NC's claims), likewise requires that market value be subtracted from the lessor's claim, and limits the lessor to "the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods are located computed for the same lease term." R.C. § 1310.74(A)(2) (emphasis added); *Information Leasing Corp. v. Chambers*, 789 N.E.2d 1155, 1169-70 (Ohio Ct. App. 2003).

---

[2] Punch's sales agreements with PE provide that they are governed by Illinois law. The lease agreements between PE and NC provide that they are governed by Ohio law.

[3] Moreover, the fact that a lease may contain an acceleration clause does not undermine the lessor's duty "to minimize its damages[.]" *Information Leasing Corp.*, 152 Ohio App. 3d at 729 (observing that Ohio law is in accordance with laws of other jurisdiction also requiring minimization of damages).

extent that Punch contends that such information is confidential and proprietary, there is a confidentiality order in place in this case, and the PE Defendants have already offered to designate any documents that Punch produces as "Attorneys Eyes Only". The PE Defendants certainly have no interest in sensitive price information for digital printers other than for use in this litigation. Moreover, the PE Defendants have agreed to narrow this request to only documents and information sufficient to show the gross and net profits, internal costs and manufacturing expenses, and not all documents concerning these topics.

**Punch's Reasons for Objections**

See above § IA.

## II. Punch Interrogatories to NC Regarding Loss Pool Calculations

Punch Graphix Americas, Inc. ("Punch") has one discovery issue to raise, which relates to the "loss pool" calculations and National City's production of documents and information concerning the same.

Count 11 of National City's Second Amended Complaint is for "Breach of Loss Pool Agreement by Punch." National City alleges that under the terms of the Loss Pool Agreement, Punch must pay National City certain amounts if there has been a transaction default, such as the failure of a purchaser to pay for equipment. *See* Second Amended Complaint, ¶ 68. National City alleges that "Punch has failed and refused to pay National City the Net Book Values under Lease Agreement Nos. 7966500000 and 953331000," the two leases at issue in this litigation.

The Loss Pool Agreement is a detailed written contract that provides for Punch, in certain circumstances, to pay National City in the event of defaults by purchasers of equipment. However, those circumstances, and whether those circumstances are present, are critical issues here.

The "pool" is a select group of leases financed by National City that make up the "loss pool." Further, the Loss Pool Agreement provides for an annual cap on Punch's liability under that contract that is dependent upon what leases are in the pool, and the status of the lease payments in the pool. *See* Second Amended Complaint, Exhibit G. Per the terms of the agreement, at the end of 2006 and each year thereafter, National City is supposed to work with Punch to establish what is the "Loss Pool Account' of leases so that a determination can be mad as to what leases are in the pool and what the amount of the cap on the loss pool obligation is. *Id.* Despite Punch's numerous attempts to work with National City to establish this Loss Pool Account, National City has refused to participate in this process or to supply any information necessary to make such a determination for 2008 or 2009. Punch has continued to seek this information from National City both through this litigation and directly from National City, and National City has not responded to these requests.

In short, documents and information showing the market price for used Xeikon 5000s are plainly relevant to both minimization of damages and the measure of damages that NC and Punch might recover in this action.

The fact that PE issued its cancellation in February 2008 does not mean that documents and information concerning sales of Xeikon 5000s in 2006 and 2007 is irrelevant. To the contrary, especially given that Punch's representation to the PE Defendants that it only sold two used Xeikon 5000s in Spring 2009 (and none in 2008), information concerning the sales of used equipment in 2006 and all of 2007 is highly relevant to ascertaining the market price for Xeikon 5000s. Just as Punch seeks to use information regarding 2009 sales (more than a year after PE's alleged breach), PE is likewise entitled to discovery of available sales information before February 2008. Ultimately, since there was no other sale of a Xeikon 5000 in February 2008, Judge Vitaliano will by necessity need to receive sales information for the bracketing preceding and subsequent years in making determinations of market price. Having price information beginning in 2006 is likewise necessary for the PE Defendants to show that the equipment rapidly depreciated in value, which the PE Defendants contend is chargeable to Punch and NC's failure to promptly repossess and sell the equipment.

Moreover, documents and information showing the sale price for new Xeikon 5000s from 2006 to present is likewise relevant and discoverable because the second printing equipment was never delivered to, or used by, PE but languished in crates in Punch's warehouse. Punch contends that this piece of equipment was a floor "demonstration model". While Punch contends that the only price information relevant for demonstration-model equipment are prices for used Xeikon 5000s from July 2007 to present, Punch is not in the position to pick and choose what information the PE Defendants may discover in support of its various defenses. Instead, given that this equipment was never removed from its crates, the equipment is more akin to new equipment and, as such, the market price for new Xeikon equipment from 2006 to present is relevant to both minimization of damages and to the measure of recoverable damages. Further Punch's objections concerning information of prices for sales of new equipment goes only to the weight that the trial court should afford such evidence, and not to the admissibility or discoverability of same. We further note that Punch does not make any argument that producing such information would be burdensome.

Ultimately, Punch's objection to production of plainly relevant market information boils down to nothing more than that the parties differing legal views on Punch's obligations to mitigate it alleged damages. By seeking to deny the PE Defendants discovery of relevant market information, Punch is inappropriately asking this Court to determine the merits of this action for trial.

Accordingly, the PE Defendants ask that the Court direct Punch to produce market information evidencing all Xeikon 5000 sales from 2006 to the present forthwith.

**Punch's Reasons for Objections**

Punch strongly disputes the PE Defendants' characterizations of the facts, and believes that this discovery dispute simply is not the venue for hashing through the parties' differences as to the underlying issues in this case. Punch responds to the PE Defendants' claimed discovery dispute as follows:

The PE Defendants claim that they need pricing information related to all new and used Xeikon 5000 sales from 2006 to the present. In order to understand why that request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence, certain facts are critical.

PE took possession of the Xeikon 5000 described in Lease No. 7965000 (the "First Xeikon"), dated November 11, 2006 (the "First Xeikon Lease"). Further, PE accepted that Xeikon on September 28, 2007. PE never took possession of the Xeikon 5000 described in Lease No. 05331000 (the "Second Xeikon"), dated February 30, 2007 (the "Second Xeikon Lease"). However, PE did not attempt to reject/repudiate the Second Xeikon until February 2008. It is Punch's position that the repudiation was untimely. Both the First Xeikon and Second Xeikon were machines used at trade shows on the demonstration floor of Photo Experts; thus, neither of the two machines sold to PE at issue was a new machine.

The PE Defendants claim that they are entitled to information concerning all sales of Xeikon 5000 machines, new or used, from 2006 to the present. Photo Experts agreed to produce, and already has produced in part, documents showing sales for ***all*** used Xeikon 5000 machines, from July 2007 through the present.

The PE Defendants claim that they are entitled to information concerning new Xeikon 5000 sales. However, there are no new Xeikon 5000s at issue in this matter. Thus, sales figures for new Xeikon 5000s are wholly irrelevant.

With regard to the First Xeikon, Uniform Commercial Code Section 2-209 is the operative damages provision at issue. That statute states, when a buyer fails to pay the price for goods as they become due, the seller may recover, along with incidental damages, ***the price of goods accepted***. 810 ILCS 5/2-709(1)(a). Thus, market price and profit are irrelevant.

Further, as referenced above, it is Punch's position that PE's attempts to reject/repudiate the Second Xeikon were untimely. Thus, the Second Xeikon is a "good accepted," and Punch's damages are governed by 810 ILCS 5/2-709(1)(a), which allow for Punch to recover the price.[4]

The PE Defendants' reliance on Section 2-708 is misplaced. This is so for the reasons set forth above. Further, Section 2-708(1) holds that the measure of damages for nonacceptance or repudiation is the difference between the market price at the time and place for tender and the unpaid contract price, together with any incidental damages, less expenses saved as a consequence of the buyer's breach. Tender of the Second Xeikon was not required until final payment was made on that machine, which did not occur before the failed repudiation. Even if one were to presume tender of the Second Xeikon was to occur at or about the time of the attempted repudiation, then the PE Defendants need no documents other than the ones that Punch already agreed to produce: the repudiation of the Second Xeikon occurred in February 2008, and Punch has agreed to provide documents concerning sales relating to used Xeikon 5000s from July 2007 through the present.

The PE Defendants are correct that, under Article 2 of the UCC, lost profits are relevant if the seller's measure of damages (which, as noted above, is the difference between market price and unpaid contract price) "is inadequate to put the seller in as good a position as performance would have." 810 ILCS 5/2-708(2). However, Punch has not made any claim that its measure of damages is inadequate. Thus, PE Defendants have requested documents concerning profit-related information that simply have no bearing to the matters at issue in this litigation.

In short, the PE Defendants are (or will be) getting all of the Xeikon 5000 sales documents that are relevant to damages, namely the documents pertaining to sales of all used Xeikon 5000s, from July 2007 through the present.

**B. The PE Defendants Request Documents and Information Concerning Punch's Profits From Sale of the Equipment at Issue**

The PE Defendants have requested that Punch produce documents sufficient to show the gross and net profits, internal costs, and manufacturing expenses associated with the two Xeikon 5000s at issue in this case. Under Article 2 of the UCC, as adopted by Illinois, lost profits are relevant if the seller's measure of damages (which, as noted above, is the difference between market price and unpaid contract price) "is inadequate to put the seller in as good a position as performance would have." 810 ILCS 5/2-708(2). Under such circumstances, the seller's measure of damages is "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer . . . ." 810 ILCS5/2-708(2) (emphasis added). To the

[4] It should be noted that where, as here, a seller sues for price and the goods are in his control, the seller may, *but is not required*, to resell them at any time prior to the collection of the judgment. 810 ILCS 5/2-709(2).

Critical to the determination of whether Punch may have any obligations under the Loss Pool Agreement for the leases at issue in this matter is an understanding of National City's position as to the status of the alleged leases and lease obligations under the Loss Pool. For example, if, due to the status of the Loss Pool leases, Punch has met its loss pool cap, then Punch maintains that National City cannot prevail on Count 11 of its Second Amended Complaint. *See* Punch's Sixth Affirmative Defense to Second Amended Complaint.

As a consequence, through its Interrogatories, Punch sought information from National City concerning its position as to what leases comprised the loss pool and what leases had been paid down or off completely in the pool. *See* Punch Interrogatory to National City ("Punch Interrogatories"), No. 5. Punch also sought information concerning what National City contended was due and owing under the Loss Pool Agreement. *Id.* at No. 6. National City refused to provide that information, claiming that the same was vague, overbroad and not reasonably calculated to lead to the discovery of admissible evidence. *See* National City's Response to Punch Interrogatories, Nos. 5-6, annexed as Exhibit B.

National City maintains that any information relevant to its claimed damages pertaining to the Loss Pool Agreement have been provided through written documents. However, Punch maintains the sole document National City has provided concerning the Loss Pool Agreement status is insufficient and the subject of an ongoing dispute between the parties. *See* Attachment 1 (letter from Candace Smith to Lisa Moore, with select information redacted). Critical to the dispute concerning the Loss Pool Agreement in this suit is what the status of the loss pool leases are and what National City's position is concerning the status of those leases. That information is relevant, narrowly tailored, and reasonably calculated to lead to the discovery of admissible evidence on National City's Loss Pool claims and Punch's affirmative defenses. For these reasons, Punch respectfully requests that National City be directed to provide full and complete responses to Punch Interrogatories Nos. 5 and 6.

**NC's Reasons for Objections**

This is a contractual dispute, not a discovery dispute. The Master Vendor Operating Agreement between National City and Punch contains a provision known as the loss pool amendment, intended as a remedy of last resort. National City invoked it in the instant case precisely as that—a remedy of last resort—because, among other things, it has an unambiguous recourse agreement on the first lease that is the subject of this action ("the Lease Buyback Guarantee Agreement") and an unimpeachable unjust enrichment claim on the second lease that is the subject of this action, a lease on which the equipment was never accepted by Photo Experts and on which Punch kept a $820,000 prepayment.

National City provided Punch with an updated loss pool calculation several months ago at Punch's request even though National City had no obligation to provide an accounting as the contractual relationship between National City and Punch had terminated. (*See* Exhibit C). We

provided the same accounting in discovery since no further payments against the loss pool have been made. At the time Punch challenged, among other things, the failure of National City to give credit against its obligation under the loss pool on a few transactions that have been paid off under independent recourse agreements. It is Punch's contention that its payments eradicate both its obligations under the recourse agreements and also lower its pool obligation and that it is entitled to "double dip." We are investigating Punch's assertions, but at this time do not believe that Punch's claim that it is due additional credit against its loss pool obligation is warranted by the language of the loss pool amendment, the negotiating history, or what appears to have been the parties' intent in entering the loss pool amendment. Instead, National City takes the position that only when the lease is not subject to an independent contractual or other legal obligation under equity or common law, is Punch entitled to a reduction in its loss pool obligation. We are also awaiting information about resale of equipment under defaulted leases; if Punch's theory is correct, which National City denies, any credits due it would need to be diminished by the amount of the resale so the credit cannot even be given at this time without the resale documents. However, we emphasize that disagreement about Punch's entitlement to credits should not be styled a failure to inform, but rather is a dispute about conflicting contractual interpretations, and National City has no obligation to reflect credits in its accounting that it believes are not contractually warranted. Discovery is not an instrument that is intended to compel an adversary to generate a new document much less insist that the document contain Punch's preferred content. If Punch believes National City's accounting is wrong, it needs to prove that in a trial on the merits, not by insisting National City give credit where it is not due.

National City reserves all objections.

**Punch's Rebuttal**

National City incorrectly sets forth the underlying facts of this matter. While doing so, National City ignores the discovery dispute at hand. National City mentions a certain loss pool calculation document and asserts that Punch is asking that National City provide a new and different document. This simply is not the case. Punch is seeking that National City provide a substantive response to two interrogatories related to National City's claims for damages. Punch asserts that it is entitled to those responses for the reasons that it already has set forth.

Notably, National City does not contend that the document it mentions is their response to the two interrogatories at issue per Rule 33(d).[5] Instead, National City simply argues that it does not need to provide any other information. As Punch is entitled to know National City's

[5] Punch does not concede that citing the document in lieu of a substantive answer is sufficient in this case due to the nature of the information sought to through the interrogatories and because the burden of deriving or ascertaining the answer from the document is not substantially the same for both Punch and National City.

basis for its claim under the Loss Pool Agreement, Punch is entitled to a full and complete response to Interrogatories Nos. 5 and 6.

*     *     *

Thank you for your consideration in this matter. We look forward to speaking with the court this Friday.

Respectfully,

Robert D. Balin /mp

Robert D. Balin

cc: Amber Christina Wessels, Esq. (via ECF and email)
Candace N. Smith, Esq. (via ECF and email)

Fredda Katcoff, Esq. (via ECF and email)